IN THE UNITED STATES DISTRICT COURT
FOR WESTERN DISTRICT OF NORTH CAROLINA
ASHEVILLE DIVISION

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH SNAPCHAT USERNAMES "eblankenship26" AND "lacilynndenise" THAT IS STORED AT PREMISES CONTROLLED BY SNAP, INC. | Case No. 1:23-mj-00057-WCM<br><br>**Filed Under Seal** |

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Robert Toler, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1. I make this affidavit in support of an application for a search warrant for information associated with Snap, Inc. accounts "eblankenship26" and "lacilynndenise" (SUBJECT ACCOUNTS) that is stored at Snap, Inc. ("Snapchat"), a company located at 2772 Donald Douglas Loop, North Santa Monica, California 90405. This location is within the Central District of California. The information to be searched is described in the following paragraphs and in **Attachment A**. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) to require Snapchat to disclose to the government copies of the information (including the content of communications) further described in Section I of **Attachment B**. Upon receipt of the information described in Section I of **Attachment B**, government-authorized persons will review that information to locate the items described in Section II of **Attachment B**.

1

2. I am a Special Agent with the United States Department of the Interior, National Park Service, Investigative Services Branch, presently assigned to the Atlantic Field Office in the Blue Ridge Parkway (BLRI). I have been employed as a federal law enforcement officer since 2012. During my tenure as a Law Enforcement Officer and Special Agent, I have completed approximately 1000 hours of instruction at the Federal Law Enforcement Training Center (FLETC) in Glynco, Georgia. I graduated from both the Land Management Police Training Program and the Department of the Interior Criminal Investigator Training Program. While at FLETC, I completed blocks of instruction and labs that enabled me to identify potential sources of electronic evidence, including but not limited to GPS, cell phones and user email accounts and social media. During all training programs, I studied various aspects of investigating and enforcing federal criminal laws. Throughout my career, I have investigated hundreds of criminal violations involving federal and state laws. I have been the lead case agent or assisted on investigations involving property crimes, violent and sexual assault crimes, and homicides. During this period of service, I have received formal training and investigative experience in general criminal statute enforcement, sexual assaults, death investigation, and traffic crash investigation.

3. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that violations of 18 U.S.C. § 1201(a)(2)

(kidnapping), 18 U.S.C. § 924(c)(1)(A)(iii) (discharge of a firearm in furtherance of a crime of violence), 18 U.S.C. § 113(a)(2) (assault with intent to commit a felony), and 18 U.S.C. § 113(a)(3) (assault with a dangerous weapon intent to do bodily harm), have been committed by EVAN WILLIAM BLANKENSHIP. There is also probable cause to search the information described in **Attachment A** for evidence, instrumentalities, contraband, and/or fruits of these crimes further described in **Attachment B**.

## JURISDICTION

5. This Court has jurisdiction to issue the requested Warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711. 18 U.S.C. §§ 2703(a), (b)(1)(A), and (c)(1)(A). Specifically, the Court is "a district court of the United States . . . that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## STATUTORY AUTHORITY

6. As noted above, this investigation concerns alleged violations of the following:

   a. 18 U.S.C. § 1201(a)(2), (d) prohibits a person from unlawfully kidnapping, abducting, seizing, confining, inveigling, decoying, or carrying away another person and holding for ransom, reward or otherwise, and attempting to do so.

   b. 18 U.S.C. § 113(a)(2) prohibits assaulting another person with the intent to commit any felony.

3

c. 18 U.S.C. § 113(a)(3) prohibits assaulting another person with a dangerous weapon, with intent to do bodily harm.

d. 18 U.S.C. § 924(c) prohibits using, carrying, brandishing, or discharging a firearm during and in relation to any crime of violence for which a person may be prosecuted in a court of the United States.

## DEFINITIONS

7. The following definitions apply to this Affidavit and **Attachment B**:

   a. "Chat," as used herein, refers to any kind of text communication over the Internet that is transmitted in real-time from sender to receiver. Chat messages are generally short in order to enable other participants to respond quickly and in a format that resembles an oral conversation. This feature distinguishes chatting from other text-based online communications such as Internet forums and email.

   b. An "Internet Protocol address" or "IP address," as used herein, refers to a unique numeric or alphanumeric string used by a computer or other digital device to access the Internet. Every computer or device accessing the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer or device may be directed properly from its source to its destination. Most Internet Service Providers ("ISPs") control a

range of IP addresses. IP addresses can be "dynamic," meaning that the ISP assigns a different unique number to a computer or device every time it accesses the Internet. IP addresses might also be "static," if an ISP assigns a user's computer a particular IP address that is used each time the computer accesses the Internet. ISPs typically maintain logs of the subscribers to whom IP addresses are assigned on particular dates and times.

c. "Mobile application" or "chat application," as used herein, are small, specialized programs downloaded onto mobile devices, computers and other digital devices that enable users to perform a variety of functions, including engaging in online chat and sending or receiving images and videos.

d. "Records," "documents," and "materials," as used herein, include all information recorded in any form, visual or aural, and by any means, whether in handmade, photographic, mechanical, electrical, electronic, or magnetic form.

**BACKGROUND INFORMATION CONCERNING SNAP, INC.**

8. Based on my training and experience, Snapchat is a mobile application made by Snap Inc., and is available through the Apple iPhone "app store" and Google Play. The application provides users a way to share photos, videos, and text. Subscribers obtain an account by downloading the free Snapchat application to their mobile media device and registering an account with Snapchat. During the registration

5

process, Snapchat asks subscribers to provide basic personal information. Therefore, the computers of Snap Inc., are likely to contain stored electronic communications and information concerning subscribers and their use of Snapchat services, such as account access information, account application information and content such as saved photos, videos, and text/chat messages.

9. Snapchat users can take photos or videos ("Snaps") using their camera phone in real-time and then select which of their friends to send the message to or make public. Unless the sender or recipient opts to save the photo or video, the message will be deleted from their devices (after the content is sent in the case of the sender and after it is opened in the case of the recipient). Users are able to save a photo or video they have taken locally to their device or to "Memories" (explained in more detail below), which is Snapchat's cloud-storage service.

10. Snapchat users can add a photo or video Snaps to their "Story." Depending on the user's privacy settings, the photos and videos added to their Story can be viewed by either all Snapchat users or just the user's friends for up to 24 hours. Stories can also be saved in Memories until deleted by the user.

11. "Memories," Snapchat's cloud-storage service, is where users can save their sent or unsent Snaps, posted stories, photos and videos from their phone's photo gallery. A user can also edit or send Snaps and create stories from these Memories. Snaps, stories, photos and videos saved in Memories are backed up by Snap Inc. and may remain in Memories until deleted by user.

12. Another feature available to Snapchat users is the chat feature. A user can type messages, send photos, videos, audio notes and video notes to friends within the Snapchat application. A user sends a chat message to a friend and once it is viewed by both the sender and the recipient, and both parties swipe away from the chat screen, the message will be cleared. Within the Snapchat application itself, a user can opt to save part of the chat by tapping on the message that they want to keep. The user can clear the message by tapping it a second time.

13. When registering a Snapchat account, the user must select a username that is a unique identifier associated with a specific user on Snapchat and cannot be changed by the user once selected. A user can also select a vanity name which is not a unique identifier and can be changed by a user or that user's friends to indicate how the user will appear within the Snapchat application.

14. In general, mobile communications providers like Snapchat will ask each of their subscribers to provide certain personal identifying information when registering for a Snapchat account which may include the subscriber's full name, username, phone number, vanity name, Snapchat account creation date and internet protocol (IP) address, and time stamps and IP address(es) of account logins and logouts.

15. Snapchat retains logs for Snaps for 30 days. Logs for posted Stories are retained for 24 hours or until deleted by the user. Chat content will be available only if the sender or the recipient chooses to save the Chat, or if the Chat is unopened (within 30 days of sending). Memories may be available until deleted by the user.

## PROBABLE CAUSE

16. At approximately 3:15 a.m. on September 28, 2023, L.P. and L.M. were together at Water Rock Knob Overlook off the Blue Ridge Parkway, which is a place within the special maritime and territorial jurisdiction of the United States, and within the Western District of North Carolina. They were alone there, parked in L.M.'s mother's car— L.M. in the driver's seat, and L.P. in the passenger seat. Suddenly, a white Chevrolet Camaro sped into the parking area. The driver accelerated around the parking lot once before heading toward L.M.'s car and abruptly stopping.

17. EVAN WILLIAM BLANKENSHIP got out of the Camaro, opened the passenger side door of L.M.'s car (where L.P. was sitting), and pointed a semi-automatic pistol at the couple. L.P. was scared that BLANKENSHIP would kill her. BLANKENSHIP then tried pulling L.P. out of the car by her hair and right arm. BLANKENSHIP repeatedly told her to get into his vehicle and that "she is coming with me." He threatened to hurt both L.P. and L.M. if she did not comply. She asked if he was taking her so that he could rape her. BLANKENSHIP nodded his head "yes."

18. BLANKENSHIP hit L.P. in the face causing temporary hearing loss in her left ear and bruising to her face. L.P. watched as BLANKENSHIP fired his gun at least once, possibly twice, into the air, before pointing it back at her and L.M.

19. The duration of the incident varied between L.P. and L.M.'s recollection, but they both indicated that L.M. was eventually able to convince BLANKENSHIP to let them go after repeatedly promising not to report the incident to the police.

20. L.M. drove them down the mountain as BLANKENSHIP followed close on their bumper. Despite the early morning hour, the pair eventually found law enforcement. BLANKENSHIP followed them until Highway 74 and sped around them to leave.

21. L.P. spoke with investigators and described knowing BLANKENSHIP from previously "hanging out" on one occasion when they drove around for a few hours. BLANKENSHIP reportedly added L.P. on the Snapchat application about a year prior (approximately September 2022), and they had not known one another independent of Snapchat prior to their one contact. I know that Snapchat is a mobile application for cellular telephones which allows users to share photos, videos, text, location, and other data with friends on the application. L.P.'s Snapchat username is "lacilynndenise".

22. L.P. believed BLANKENSHIP was able to locate her the morning of the incident by using Snapchat's live location sharing feature, whereby her real-time location was visible to her friends on the application. Having met BLANKENSHIP only one time in person, L.P. said she was "9 out of 10" that it was BLANKENSHIP who confronted them that morning. L.M. did not personally know BLANKENSHIP but identified him as the perpetrator from a picture shown to him.

23. Investigators returned to the scene the next day to search for spent shell casings. They were unable to locate any.

24. BLANKENSHIP was interviewed on September 29. Prior to the interview, BLANKENSHIP let officers know a 9mm Glock was in his Camaro. The

9

Camaro was unlocked with the windows down as he went with officers for the interview. Officers asked to secure the weapon for safety, and BLANKENSHIP allowed them to do so. They later retained it as evidence and provided BLANKENSHIP with a property receipt.

25. BLANKENSHIP initially stated he was at work during the time of this incident. He showed officers his cellular telephone and an application called Life 360, which he purported showed him leaving his home at 1:47am and returning at 3:18am. When pushed about his whereabouts, he changed course and said he started drinking to excess on the September 27 and became intoxicated. When he woke up on the September 28, he noticed his car was out of gas, so he knew he had to have gone somewhere. BLANKENSHIP again claimed to have no recollection of these events.

26. Agents pressed him further to be remorseful and be honest. BLANKENSHIP said he would feel more comfortable if the interview was not recorded. Agents turned off their recording devices at BLANKENSHIP's request.

27. BLANKENSHIP then claimed he and L.P. were "friends with benefits" and had been exchanging nude photos. He stated that he texted L.P. on the Snapchat app around 10:00 p.m. on the September 27 to hang out. She replied, he claimed, that she was tired and wanted to be at home. BLANKENSHIP claimed he was disappointed and began drinking heavily. While drinking, he noticed L.P.'s Snapchat location showed her on the Blue Ridge Parkway. This upset him, so he decided to go "scare her."

28. BLANKENSHIP admitted driving a white Camaro to the area where she was located and got out with his 9mm Glock in hand. He opened the passenger door and demanded that L.P. get in his car. He grabbed her by the hair and continued to order her into his car. BLANKENSHIP said he slapped her when she reached for her phone.

29. BLANKENSHIP admitted he was angry and fired one round toward the ground. He noticed that the shell casing failed to extract from the chamber but continued to point the gun at L.M. and L.P. Eventually, L.M. was able to convince him this was wrong, and BLANKENSHIP let them leave. He followed them down the Parkway, then texted L.P. via Snapchat not to mention the incident to anyone. He then changed the settings in Snapchat to immediately delete their messages. BLANKENSHIP's Snapchat reported that his username is "eblankenship26." He indicated to agents that all of his interactions with L.P. on Snapchat were done using his cellular telephone. Officers did not collect BLANKENSHIP's cell phone at that time.

30. Based on the information gathered during the investigation, investigators issued a preservation request to Snap, Inc. for the SUBJECT ACCOUNTS.

## CONCLUSION

31. Based on the forgoing, I request that the Court issue the proposed search warrant.

32. Pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant. The government will execute this warrant by serving the warrant on Snapchat. Because the warrant will be served on Snapchat, which will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

*This affidavit was reviewed by AUSA Alex M. Scott.*

/s/ Robert Toler
Robert Toler, Affiant
Special Agent – APS

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this 19th day of October, 2023, at 10:38 AM.

Signed: October 19, 2023

W. Carleton Metcalf
United States Magistrate Judge

# ATTACHMENT A

## Property to be searched

This Warrant applies to information associated with Snapchat usernames "eblankenship26" and "lacilynndenise" (SUBJECT ACCOUNTS) that is stored at premises owned, maintained, controlled, or operated by Snap, Inc., a company located at 2772 Donald Douglas Loop North, Santa Monica, California 90405.

These account records were preserved under submission/Case ID 6e1523141f.

# ATTACHMENT B

## Items to be seized

**I.  Information to be disclosed by Snap, Inc.**

To the extent that the information described in **Attachment A** is within the possession, custody, or control of Snap, Inc., including any messages, records, files, logs, or information that have been deleted but are still available to Snap, Inc. or have been preserved pursuant to a request made under 18 U.S.C. § 2703(f), Snap, Inc. is required to disclose the following information to the Government for each account or identifier listed in **Attachment A** since September 1, 2022, including:

a. all files, including video files, text, text files, images, multimedia, chats, and instant messages ("IMs") presently contained in the account or stored on behalf of the user;

b. the contents of any Snaps, Stories, Chats and Memories;

c. all business records and subscriber information, in any form kept, pertaining to the individual accounts described, including full name, user name, vanity name, physical address, telephone numbers, email addresses, registration details, date account was opened, length of service, the types of service utilized, ESN (Electronic Serial Number) or other unique identifier for the device(s) associated with the account, Social Security number, date of birth, and other identifiers or records associated with the account;

14

d. all transactional information of all activity of the accounts, including records of session times and durations, IP address used to register the account, IP addresses associated with session times and dates, account status and log files of Snaps, Stories, Chats and Memories;

e. all contacts/friends lists;

**f.** all communications between Snapchat and the user(s) regarding the account(s), including contacts with support services and records of actions taken;

g. Logs, including sender, recipient, date, and time, concerning the previous Snaps sent to or from the Snapchat account(s) with the username(s) "eblankenship26" and "lacilynndenise";

h. Location data associated with the account(s)

Snap, Inc. is hereby ordered to disclose the above information to the government within fourteen days of issuance of this warrant.

II. **Information to be seized by the Government**

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. § 1201(a)(2) (kidnapping), 18 U.S.C. § 924(c)(1)(A)(iii) (discharge of a firearm in furtherance of a crime of violence), 18 U.S.C. § 113(a)(2) (assault with intent to commit a felony), and 18 U.S.C. § 113(a)(3) (assault with a dangerous weapon intent to do bodily harm) involving Evan Blankenship and the accounts listed in Attachment A, from 00:00:00 (UTC) on September 1, 2022, to present for information pertaining to the following matters:

15

a. The identity of the person(s) who created or used the user IDs, including records that help reveal the whereabouts of such person(s) at the time the offenses were committed ;

b. Any communications, texts, pictures, videos, and/or attachments sent or exchanged between the SUBJECT ACCOUNTS;

c. Any information from friends or contacts lists indicating that the holders of the SUBJECT ACCOUNTS knew each other and/or communicated with each other;

d. Any information concerning the location monitoring and sharing settings of the SUBJECT ACCOUNTS, to include whether the "lacilynndenise" account holder enabled location monitoring that would permit the "eblankenship26" account holder to physically locate and track the "lacilynndenise" account holder.

This warrant authorizes a review of electronically stored information, communications, other records and information disclosed pursuant to this warrant in order to locate evidence, fruits, and instrumentalities described in this warrant. The review of this electronic data may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the FBI may deliver a complete copy of the disclosed electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

If the Government, when reviewing the information and documents seized pursuant to this warrant or order, encounters materials that reasonably appear on their face to be subject to the attorney-client privilege or protected by the work product doctrine ("Potentially Protected Materials"), the Government shall immediately cease any further review of those materials. The Potentially Protected Materials must then be sequestered and maintained in such a way that they cannot be accessed inadvertently. In the ordinary course, the Government should then contact the potential privilege holder to determine if an agreement can be reached for how the Potentially Protected Materials will be reviewed. However, in cases when an investigation is covert and the Government otherwise reasonably believes there is a compelling need for the Potentially Protected Materials to be processed before notice is given to the potential privilege holder, the Government may request, upon written motion supported by applicable authorities, that the Court authorize an appropriate protocol for such a review. In no such case though, may Potentially Protected Materials be reviewed absent an agreement between the Government and the potential privilege holder or an order of the Court. *See* North Carolina RPC 252; accord Fed. R. Civ. P. 45(e)(2)(B) (describing handling of privileged material produced in response to a subpoena).

# **CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)**

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by Snap, Inc. and my title is

_____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of Dropbox, Inc. The attached records consist of _____

**[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of Snap, Inc., and they were made by Snap, Inc. as a regular practice; and

b.     such records were generated by Snap, Inc. electronic process or system that produces an accurate result, to wit:

    1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of Snap, Inc. in a manner to ensure that they are true duplicates of the original records; and

    2.     the process or system is regularly verified by Snap, Inc., and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

| Date | Signature |
|---|---|